Slip Op. 25-66

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC;<br><br>   **Plaintiffs,**<br><br>    **v.**<br><br>THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; and HOWARD LUTNICK, in his official capacity as Secretary of Commerce;<br><br>   **Defendants.** | **Before:** Gary S. Katzmann, Judge<br>    Timothy M. Reif, Judge<br>    Jane A. Restani, Judge<br><br>**Court No. 25-00066** |
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS, THE STATE OF MAINE; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; and THE STATE OF VERMONT;<br><br>   **Plaintiffs,**<br><br>    **v.** | **Before:** Gary S. Katzmann, Judge<br>    Timothy M. Reif, Judge<br>    Jane A. Restani, Judge<br><br>**Court No. 25-00077** |

> **UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. CUSTOMS AND BORDER PROTECTION; PETE R. FLORES in his official capacity as Acting Commissioner for United States Customs and Border Protection; and THE UNITED STATES OF AMERICA;**
>
> **Defendants.**

## OPINION

[ The court grants Plaintiffs' Motions for Summary Judgment and denies Plaintiffs' Motions for Preliminary Injunction as moot. ]

Dated: <u>May 28, 2025</u>

<u>Jeffrey M. Schwab</u>, Liberty Justice Center, of Austin, Tex., argued for Plaintiffs V.O.S. Selections, Inc; Plastic Services and Products, LLC d/b/a Genova Pipe; MicroKits, LLC; FishUSA Inc.; and Terry Precision Cycling LLC. With him on the briefs were <u>Reilly Stephens</u>, <u>James McQuaid</u>, <u>Bridget F. Conlan</u>, and <u>Ilya Somin</u>, Antonin Scalia Law School, George Mason University, of Arlington, Vir.

<u>Brian Simmonds Marshall</u>, Senior Assistant Attorney General, Oregon Department of Justice, of Portland, Or., argued for Plaintiffs The State of Oregon, The State of Arizona, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, The State of Maine, The State of Minnesota, The State of Nevada, The State of New Mexico, The State of New York, and The State of Vermont. With him on the briefs were <u>Dan Rayfield</u>, Attorney General of State of Oregon, <u>Benjamin Gutman</u>, Solicitor General, <u>Dustin Buehler</u>, Special Counsel, <u>Christopher A. Perdue</u>, <u>Leigh Salmon</u>, and <u>Nina R. Englander</u>, Senior Assistant Attorneys General, <u>YoungWoo Joh</u> and <u>Alexander C. Jones</u>, Assistant Attorneys General, of the State of Oregon; <u>Kristin K. Mayes</u>, Attorney General of the State of Arizona, <u>Joshua D. Bendor</u>, Solicitor General, <u>Syreeta A. Tyrell</u>, Senior Litigation Counsel, of the State of Arizona; <u>Keith Ellison</u>, Attorney General of the State of Minnesota and <u>Peter J. Farrell</u>, Deputy Solicitor General of the State of Minnesota; <u>Philip J. Weiser</u>, Attorney General of the State of Colorado and <u>Sarah H. Weiss</u>, Senior Assistant Attorney General of the State of Colorado; <u>William Tong</u>, Attorney General of the State of Connecticut, and <u>Michael K. Skold</u>, Solicitor General of the State of Connecticut; <u>Kathleen Jennings</u>, Attorney General of the State of Delaware, and <u>Ian R. Liston</u>, Director of Impact Litigation, <u>Vanessa L. Kassab</u>, Deputy Attorney General of the Delaware Department of Justice; <u>Aaron D. Ford</u>, Attorney General of the State of Nevada, and <u>Heidi Parry Stern</u>, Solicitor General

of the Office of the Nevada Attorney General; Raúl Torrez, Attorney General of the State of New Mexico, James W. Grayson, Chief Deputy Attorney General, and Amy Senier, of the New Mexico Department of Justice; Letitia James, Attorney General of the State of New York, Rabia Muqaddam, Special Counsel for Federal Initiatives, and Mark Ladov, Special Counsel, of the State of New York; Kwame Raoul, Attorney General of the State of Illinois, Cara Hendrickson, Assistant Chief Deputy Attorney General, and Gretchen Helfrich, Deputy Chief, Special Litigation Bureau of the Office of the Illinois Attorney General; Aaron M. Frey, Attorney General of the State of Maine, and Vivian A. Mikhail, Deputy Attorney General, of the State of Maine; and Charity R. Clark, Attorney General of the State of Vermont, and Ryan P. Kane, Deputy Solicitor General of the State of Vermont.

Eric J. Hamilton, Deputy Assistant Attorney General, U.S. Department of State, of Washington, D.C., argued for Defendants The United States Of America; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; Jamieson Greer, in his official capacity as United States Trade Representative; Office of the United States Trade Representative; and Howard Lutnick, in his official capacity as Secretary of Commerce. With him on the briefs were Yaakov M. Roth, Acting Assistant Attorney General, Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-in-Charge, International Trade Office, and Sosun Bae, Senior Trial Counsel. Of counsel, Alexander K. Haas, Director, and Stephen M. Elliott, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C; and Luke Mathers and Blake W. Cowman, Trial Attorneys, U.S. Department of Justice Civil Division, Commercial Litigation Branch, of Washington, D.C.

Brett A. Shumate, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants U.S. Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security; U.S. Customs and Border Protection; Pete R. Flores in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and the United States. With him on the briefs were Yaakov M. Roth, Acting Assistant Attorney General, Eric J. Hamilton, Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, Justin R. Miller, Attorney-in-Charge, International Trade Office, Sosun Bae, Senior Trial Counsel, Luke Mathers, Catherine M. Yang, Blake W. Cowman, and Collin T. Mathias, trial attorneys. Of counsel, Alexander K. Haas, Director, and Stephen M. Elliott, Assistant Director, U.S. Department of Justice, Civil Division, Federal Programs Branch, of Washington D.C.

Per Curiam: The Constitution assigns Congress the exclusive powers to "lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3. The question in the two cases before the court is whether the International Emergency Economic Powers Act of 1977 ("IEEPA") delegates these powers to the President in the form of authority to impose unlimited tariffs on goods from nearly every country

in the world. The court does not read IEEPA to confer such unbounded authority and sets aside the challenged tariffs imposed thereunder.

**BACKGROUND**

### I.      Legal Background

### A.      The Constitution

While "Congress . . . may not transfer to another branch powers which are strictly and exclusively legislative . . . Congress . . . may confer substantial discretion . . . to implement and enforce the laws." Gundy v. United States, 588 U.S. 128, 135 (2019) (internal quotation marks and citation omitted). Thus, courts have consistently upheld statutory delegations as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise that authority] is directed to conform." Mistretta v. United States, 488 U.S. 361, 372 (1989) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)). This reflects the idea that in modern government, "[t]he legislative process would frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation." American Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946).

### B.      Tariffs

Early in the nation's history, tariffs were a key means by which the federal government raised money to pay wages and to fund the national debt. See John M. Dobson, Two Centuries of Tariffs: The Background and Emergence of the U.S. International Trade Commission 6 (U.S. Int'l Trade Comm'n 1976). The revenue-raising purpose of tariffs has declined significantly since the ratification of the Sixteenth Amendment in 1913 permitted the imposition of income taxes. See id. at 1, 70. Since then, and with the increasing complexity and interconnectedness of the global

economic landscape, tariffs have served more diverse purposes including restricting the importation of certain goods, protecting American industry, and leveraging negotiations with foreign counterparts. See, e.g., id. at 80 (describing the use of tariffs to restrict Japanese textile imports).

As global economic relations grew in volume and complexity, Congress saw a need for specialized, nonpartisan assistance in administering tariffs. See id. at 87. Congress accordingly passed legislation creating the United States Tariff Commission, later renamed the United States International Trade Commission ("ITC"). See id.; Revenue Act of 1916, Pub. L. 64-271, §§ 700–09, 39 Stat. 756, 795–98. To provide this assistance, the Commission "shall have the power to investigate the tariff relations between the United States and foreign countries, commercial treaties, . . . the volume of importations compared with domestic production and consumption, and conditions, causes, and effects relating to competition of foreign industries with those of the United States." 19 U.S.C. § 1332. The ITC is responsible for maintaining the United States Harmonized Tariff Schedule ("HTSUS"), which sets tariff rates for all merchandise imported into the United States. See id. § 1202. The HTSUS itself "is indeed a statute but is not published physically in the United States Code." Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999). Congress's enactment of the HTSUS provided that its terms "shall be considered to be statutory provisions of law for all purposes." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1204(c)(1), 102 Stat. 1107, 1149.

In addition to forming the ITC, Congress has responded to the growing complexity of global economic relations by delegating trade authority to the President. These delegations have included clear limitations that retain legislative power over the imposition of duties and over

foreign commerce. See, e.g., Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 305 (1933) ("What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the legislative process.").

For example, in 1962, Congress delegated to the President the power to take action to adjust imports when the Secretary of Commerce finds that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b), 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862(c)(1)(A)). This delegation is conditioned upon an investigation and findings by the Secretary of Commerce, and agreement by the President. See id. Section 301 of the Trade Act of 1974, as amended, requires that the U.S. Trade Representative ("USTR") take action, which may include imposing tariffs, where "the rights of the United States under any trade agreement are being denied" or "an act, policy, or practice of a foreign country" is "unjustifiable and burdens or restricts United States commerce." 19 U.S.C. § 2411(a)(1)(A)–(B). The USTR may impose duties also where the USTR determines that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce." Id. § 2411(b)(1). This power is conditioned on extensive procedural requirements including an investigation that culminates in an affirmative finding that another country imposed unfair trade barriers under § 2411(a)(1)(A) or (B) or § 2411(b), and a public notice and comment period. See id. § 2414(b).

### C.     *Presidential Authority to Regulate Importation During National Emergencies*

In 1917, Congress passed the Trading with the Enemy Act ("TWEA") to grant the President powers to regulate international transactions with enemy powers following the entry of the United States into World War I.  See Trading with the Enemy Act, Pub. L. No. 65-91, § 2, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. §§ 4301 to 4341); see also Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45168, The International Emergency Economic Powers Act: Origins, Evolution, and Use 2–3 (2024).  The Great Depression then led Congress to expand the President's authority under TWEA to declare states of emergency and exercise authority over international trade even outside times of war.  See Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48 Stat. 1, 1–2 (1933) (amending TWEA).  TWEA, as amended, grants the President the broad authority to "regulate . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 4305(b)(1)(B).

In 1974, the United States Customs Court, the predecessor to the United States Court of International Trade, heard a challenge to President Nixon's imposition of a supplemental duty on all dutiable merchandise imported into the United States.  See Yoshida Int'l, Inc. v. United States, 378 F. Supp. 1155 (1974) ("Yoshida I"); see also Proclamation No. 4074, Imposition of Supplemental Duty for Balance of Payments Purpose, 85 Stat. 926 (Aug. 15, 1971).  The Government argued that President Nixon's actions were lawfully authorized by TWEA.  Yoshida I, 378 F. Supp. at 1157.  The U.S. Customs Court construed TWEA "so as to preserve its constitutionality" and held that TWEA "precludes the President from laying the supplemental duties provided by [President Nixon]."  Id. at 1173.  The United States Court of Customs and Patent Appeals, the predecessor to the United States Court of Appeals for the Federal Circuit

("Federal Circuit"), reversed the lower court's decision, holding that President Nixon's duties were "within the power constitutionally delegated to him." United States v. Yoshida Int'l. Inc., 526 F.2d 560, 584 (C.C.P.A. 1975) ("Yoshida II"). The court reasoned that "Congress, in enacting [TWEA], authorized the President, during an emergency, to exercise the delegated substantive power, i.e., to 'regulate importation,' by imposing an import duty surcharge or by other means appropriately and reasonably related . . . to the particular nature of the emergency declared." Id. at 576.

Shortly after this decision and following a review by a Senate bipartisan special committee, Congress reformed the President's emergency powers. As part of this reform, Congress cabined the President's powers under TWEA to wartime. See Amendments to the Trading with the Enemy Act, Pub. L. No. 95-223, § 101–03, 91 Stat. 1625, 1625–26 (1977) ("[TWEA] is amended by striking out 'or during any other period of national emergency declared by the President' in the text preceding subparagraph (A)."). Congress also enacted a new statute, IEEPA, to confer "upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to more procedural limitations, including those of the National Emergencies Act." Comm. on Int'l Rels., Trading with the Enemy Act Reform Legislation, H.R. Rep. No. 95-459, at 2 (1977); see also International Emergency Economic Powers Act, Pub. L. No. 95-223, § 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10). Congress drew much of the relevant language in IEEPA from TWEA, including language authorizing the President to "regulate . . . importation . . . of . . . any property in which any foreign country or a national thereof has any interest by any person . . . subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B). In full, the relevant provision

of IEEPA provides that the President may:

> (A) investigate, regulate, or prohibit—
>
>> (i) any transactions in foreign exchange,
>>
>> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>>
>> (ii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

Id. § 1702.  IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose."  Id. § 1701(b).

### D.      The National Emergencies Act

As part of Congress's reform of the President's emergency powers and in addition to amending TWEA and enacting IEEPA, Congress enacted the National Emergencies Act ("NEA") in 1976.  See National Emergencies Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C. § 1622).  That act provided for the termination of all existing emergencies in 1978, except those making use of TWEA, and placed new restrictions on the declaration of emergencies.  Id.  First, the NEA requires the President to transmit to Congress a notification of the declaration of a national emergency.  Id.  Second, the act requires a biannual review whereby "each House of Congress shall meet to consider a vote on a . . . resolution to

determine whether that emergency shall be terminated." Id.  At the time of its enactment in 1976, the NEA afforded Congress the means to terminate a national emergency by adopting a concurrent resolution in each chamber.  See id.  However, the Supreme Court later found Congress's use of unicameral legislative vetoes, which terminated executive determinations without presentment, to be unconstitutional.  See INS v. Chadha, 462 U.S. 919 (1983).  Congress subsequently amended the NEA to require a joint resolution rather than a concurrent resolution to align the statutory scheme with the implicit logic of Chadha.  See Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50 U.S.C. § 1622).  Following Chadha, congressional action terminating a national emergency is still subject to presidential veto, making congressional review no more than the ordinary power to legislate.

## II.     Factual Background

Since taking office on January 20, 2025, the President has declared several national emergencies and imposed various tariffs in response.  The President has subsequently issued a number of pauses and modifications to those tariffs, as outlined in detail below.

### A.     Trafficking Tariffs

On the date of his inauguration, the President issued Executive Order 14157, declaring a national emergency under IEEPA to deal with the threats posed by international cartels that "have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs."  Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 Fed. Reg. 8439, 8439 (Jan. 20, 2025).  The President

issued Proclamation 10886 on the same day, declaring a national emergency at the southern border caused by "cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans." Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025).

Shortly thereafter, the President expanded the national emergency "to cover the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025) ("Canada Tariff Order"). Similarly, the President expanded the national emergency "to cover the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025) ("China Tariff Order").

In response to these emergencies, the President imposed 25 percent ad valorem duties on articles that are products of Canada and Mexico, see Executive Order 14193, 90 Fed. Reg. at 9114; Executive Order 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025) ("Mexico Tariff Order"), and a 10 percent ad valorem duty on articles that are the products of China, see Executive Order 14195, 90 Fed. Reg. at 9122. The President imposed a lower 10 percent ad valorem rate on energy and energy resources from

Canada.  See Executive Order 14193, 90 Fed. Reg. at 9114.  These duties were to take effect on February 4, 2025.  See id.  The President later raised the trafficking tariffs on Chinese products from 10 percent to 20 percent.  See Executive Order 14228, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 11463, 11463 (Mar. 3, 2025).

On February 3, shortly after imposing the trafficking tariffs, the President issued two additional executive orders, finding that the governments of Mexico and Canada "ha[ve] taken immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions."  Executive Order 14198, Progress on the Situation at Our Southern Border, 90 Fed. Reg. 9185, 9185 (Feb. 3, 2025); Executive Order 14197, Progress on the Situation at Our Northern Border, 90 Fed. Reg. 9183, 9183 (Feb. 3, 2025).  As a result, the President imposed a pause on the 25 percent duties on Mexican and Canadian products and on the 10 percent duties on Canadian energy and energy resources, moving the effective date of those duties to March 4, 2025.  See id.

Since the trafficking tariffs took effect on February 4 for China and March 4 for Canada and Mexico, the President has modified the rates further.  The President lowered the duty rate for potash[1] from Canada and Mexico to 10 percent.  See Executive Order 14231, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11785, 11785 (Mar. 6, 2025); Executive Order 14232, Amendment to Duties To Address the Flow of

---

[1] Potash is a soluble source of potassium and is primarily used as an agricultural fertilizer.  See National Minerals Information Center, Potash Statistics and Information, U.S. Geological Service, https://www.usgs.gov/centers/national-minerals-information-center/potash-statistics-and-information (last visited May 28, 2025).

Illicit Drugs Across Our Southern Border, 90 Fed. Reg. 11787, 11787 (Mar. 6, 2025).

Additionally, the President implemented duty-free de minimis treatment for otherwise eligible

covered articles. See Executive Order 14226, Amendment to Duties to Address the Flow of Illicit

Drugs Across Our Northern Border, 90 Fed. Reg. 11369, 11369 (Mar. 2, 2025); Executive Order

14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 Fed. Reg.

11371, 11371 (Mar. 2, 2025); Executive Order 14200, Amendment to Duties Addressing the

Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9277, 9277 (Feb.

5, 2025). The President later removed this duty-free de minimis treatment for Chinese products.

See Executive Order 14256, Further Amendment to Duties Addressing the Synthetic Opioid

Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg.

14899, 14899 (Apr. 2, 2025).

Currently, the trafficking tariffs all remain in place, set at 25 percent for Mexican and

Canadian products and at 20 percent for Chinese products. The tariffs on Canadian energy and

energy resources remain at the lower 10 percent rate. All of these tariffs, including the

modifications listed here, are hereafter referred to as the "Trafficking Tariffs."

### B.     Worldwide and Retaliatory Tariffs

On April 2, 2025, the President issued Executive Order 14257, invoking IEEPA to impose

a general 10 percent ad valorem duty on "all imports from all trading partners," which "shall

increase for" a list of 57 countries to higher rates ranging from 11 percent to as high as 50 percent

ad valorem. Executive Order 14257, Regulating Imports With a Reciprocal Tariff to Rectify Trade

Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90

Fed. Reg. 15041, 15045 (Apr. 2, 2025). The President imposed these tariffs in response to a

national emergency with respect to "underlying conditions, including a lack of reciprocity in our

bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." Id. at 15041.  The President stated that these "large and persistent annual U.S. goods trade deficits" constitute an "unusual and extraordinary threat to the national security and economy of the United States," having "its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system." Id.  On April 9, 2025, the President issued another Executive Order that paused, for all countries but China, the implementation of the higher country-specific tariffs for 90 days, moving their effective date to July 9, 2025. See Executive Order 14266, Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025).

As China responded to the various country-specific tariff adjustments by adjusting its own tariff rates on U.S. goods, the President has amended the duty rate on Chinese goods several times in retaliation.  The President first increased the China-specific duty rate from 34 to 84 percent effective April 8, see Executive Order 14259, Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China, 90 Fed. Reg. 15509, 15509 (Apr. 8, 2025), and then from 84 to 125 percent effective April 10, 2025, see Executive Order 14266, 90 Fed. Reg. at 15626.

Currently, the worldwide tariffs remain in place at 10 percent for all countries, while the country-specific higher rates are set to take effect on July 9, 2025.  The China-specific rate is now

also at 10 percent[2] after President Trump lowered the 125 percent retaliatory tariffs in response to China, taking "a significant step . . . toward remedying non-reciprocal trade arrangements and addressing the concerns of the United States relating to economic and national security matters." Executive Order 14298, Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China, 90 Fed. Reg. 21831, 21831 (May 12, 2025). This lower rate is effective until August 12, 2025. See id. All of these tariffs, including the modifications listed here, are hereafter referred to as the "Worldwide and Retaliatory Tariffs."

### III.    Procedural Background

The V.O.S. Plaintiffs brought an action against Defendants the United States, the President, and certain agencies and officials (collectively, "the Government") on April 14, 2025, challenging the President's imposition of the Worldwide and Retaliatory Tariffs in Executive Orders 14257 and 14266. See Compl., V.O.S. v. United States, No. 25-00066, Apr. 14, 2025, ECF No. 2 ("V.O.S. Compl."), and subsequently filed an application for a temporary restraining order alongside motions for preliminary injunction and summary judgment. See Application for TRO & Mot. for Prelim. Inj., and or Summ. J., V.O.S. v. United States, No. 25-00066, Apr. 18, 2025, ECF No. 10 ("Pls.' V.O.S. Mots."). After the court denied the motion for a temporary restraining order, see Order Denying TRO, V.O.S. v. United States, No. 25-00066, Apr. 22, 2025, ECF No. 13, the Government filed its combined response, see Resp. in Opp'n to Mot. for Summ. J. and Prelim. Inj., V.O.S. v. United States, No. 25-00066, Apr. 29, 2025, ECF No. 32 ("Gov't Resp. to V.O.S. Mots."), and the V.O.S. Plaintiffs replied on May 6, 2025, see Reply in Supp. of Mots. for

---

[2] This 10 percent rate is in addition to the 20 percent Trafficking Tariff addressed above. The total rate on Chinese goods is thus currently set at 30 percent (subject to various exemptions not discussed here).

Prelim. Inj. and Summ. J., <u>V.O.S. v. United States</u>, No. 25-00066, May 6, 2025, ECF No. 35 ("Pls.' <u>V.O.S.</u> Reply").[3]

After the <u>V.O.S.</u> Plaintiffs filed their motions and during briefing in that case, the State Plaintiffs brought a similar action against the Government on April 23, 2025, challenging the President's Worldwide and Retaliatory Tariffs along with the President's imposition of Trafficking Tariffs in Executive Orders 14193, 14194, and 14195. <u>See</u> Compl., <u>Oregon v. United States</u>, No. 25-00077, Apr. 23, 2025, ECF No. 2 ("<u>Oregon</u> Compl."). The plaintiffs in <u>Oregon</u> ("State Plaintiffs") filed their own motion for preliminary injunction on May 7, 2025, <u>see</u> Or. Pls.' Mot., <u>Oregon v. United States</u>, No. 25-00077, May 7, 2025, ECF No. 14 ("Pls.' <u>Oregon</u> Mot."). The court construed the State Plaintiffs' motion for preliminary injunction as a motion for summary judgment, <u>see</u> Order Construing Mot. for Prelim. Inj. as Mot. for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 8, 2025, ECF No. 18, the State Plaintiffs filed a supplemental brief, <u>see</u> Supp'l Resp. to Mot. for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 13, 2025, ECF No. 32 ("Pls.' <u>Oregon</u> Supp'l Br."), the Government responded, <u>see</u> Gov't Resp. in Opp'n to Mot. for Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 16, 2025, ECF No. 41, and the State Plaintiffs replied, <u>see</u> Reply in Supp. of Summ. J., <u>Oregon v. United States</u>, No. 25-00077, May 20, 2025, ECF No. 47 ("Pls.' <u>Oregon</u> Reply"). The Government filed an amended response shortly thereafter. <u>See</u> Order for Amended Resp., May 17, 2025, <u>Oregon v. United States</u>, No. 25-00077, ECF No. 42; Amended Resp., <u>Oregon v. United States</u>, No. 25-00077, May 19, 2025, ECF No. 46

---

[3] Several entities filed amicus briefs in support of the Plaintiffs in <u>V.O.S.</u> <u>See</u> Amici Curiae Br., <u>V.O.S. v. United States</u>, No. 25-00066, Apr. 28, 2025, ECF No. 31 ("Legal Scholars Amicus Br."); Mot. for Leave to File an Amici Curiae Br., <u>V.O.S. v. United States</u>, No. 25-00066, May 12, 2025, ECF No. 49 ("Princess Awesome Amicus Br."); Amicus Curiae Br., <u>V.O.S. v. United States</u>, No. 25-00066, May 9, 2025, ECF No. 44 ("Inst. for Pol. Integrity Amicus Br.").

("Gov't Resp. to Oregon Mots.").[4]  The court held oral argument in V.O.S. on Tuesday, May 13,

2025, and in Oregon on Wednesday, May 21, 2025.

## JURISDICTION

The Court of International Trade has exclusive jurisdiction to hear this action under 28

U.S.C. § 1581(i), which gives the court:

> exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--
>
> > (A) revenue from imports or tonnage;
> >
> > (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
> >
> > (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
> >
> > (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

Id. § 1581(i)(1); see also id. § 1337(c) ("The district courts shall not have jurisdiction under this

section of any matter within the exclusive jurisdiction of the Court of International Trade . . . .").

Here, the plaintiffs in both cases (collectively, "Plaintiffs") challenge tariffs imposed by the

President under IEEPA, which provides that the President, under certain conditions and with some

---

[4] Several entities filed amicus briefs in support of the Plaintiffs in Oregon.  See Amicus Curiae Br., Oregon v. United States, No. 25-00077, May 16, 2025, ECF No. 40 ("Members of Congress Amicus Br."); Amicus Curiae Br., Oregon v. United States, No. 25-00077, May 15, 2025, ECF No. 38 ("Cal. Amicus Br."); Amicus Curiae Br., Oregon v. United States, No. 25-00077, May 20, 2025, ECF No. 53 ("Wash. Amicus Br.").  One party filed an amicus brief in support of the Government in Oregon.  See Amicus Curiae Br., Oregon v. United States, No. 25-00077, May 20, 2025, ECF No. 51 ("America First Legal Found. Amicus Br.").

elsewhere-enumerated exceptions, may:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B). The challenged Executive Orders, in turn, invoke this statute to impose tariffs (alternatively referred to as "duties") on merchandise from both specific countries and a list that includes "all trading partners" of the United States. See, e.g., Executive Order 14266, 90 Fed. Reg. at 15645. The Executive Orders made amendments to the HTSUS, which are set forth in subheading 9903.01. The HTSUS is the law of the United States setting tariffs.[5]

For the purpose of locating jurisdiction under 28 U.S.C. § 1581(i), an action involving a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a "law providing for" those measures. See Luggage & Leather Goods Mfrs. of Am., Inc. v. United States, 7 CIT 258, 267, 588 F. Supp. 1413, 1419–21 (1984); U.S. Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 200–01, 544 F. Supp. 883, 886 (1982), aff'd, 683 F.2d 399 (C.C.P.A. 1982); see also 28 U.S.C. § 255 (contemplating "civil action[s]" falling under this court's jurisdiction that "raise[] . . . issue[s] of the constitutionality of . . . a proclamation of the

---

[5] This does not mean that Plaintiffs' ultra vires claims must instead route through 28 U.S.C. § 1581(a), which provides for "any civil action commenced to contest the denial of a protest" to "the . . . amount of duties chargeable" on an entry, 19 U.S.C. § 1514(a)(2). As the Supreme Court has explained, "protests are not pivotal" in circumstances where Customs operates under a binding external directive—as where "Customs performs no active role, it undertakes no analysis or adjudication, issues no directives, imposes no liabilities; instead, Customs merely passively collects . . . payments." United States v. U.S. Shoe Corp., 523 U.S. 360, 365 (1998) (internal quotation marks, alterations, and citation omitted).

President or an Executive order"). The Federal Circuit has confirmed that presidential action creates an appropriate basis for (i) jurisdiction, noting without disapproval that there are "numerous cases in which the Court of International Trade has . . . considered challenges to the actions of the President pursuant to the grant of jurisdiction in § 1581(i)." Humane Soc'y of United States v. Clinton, 236 F.3d 1320, 1327 (Fed. Cir. 2001) (citing, inter alia, Luggage & Leather Goods, 7 CIT 258, 588 F. Supp. 1413 and U.S. Cane Sugar Refiners' Ass'n, 3 CIT 196, 544 F. Supp. 883).

This means that Plaintiffs' various challenges to the presidential actions here, successful or not, fall under this court's exclusive jurisdiction. And while "section 1581(i) does not authorize proceedings directly against the President," meaning the President must be dismissed from the two cases before the court, Corus Grp. PLC. v. ITC, 352 F.3d 1351, 1359 (Fed. Cir. 2003), the court retains "jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential directives," USP Holdings, Inc. v. United States, 36 F.4th 1359, 1366 (Fed. Cir. 2022). That group covers the rest of the named Defendants in both cases. All relief will run against the United States and its "officers," a category which for jurisdictional purposes does not include the President. See 28 U.S.C. § 1581(i).

## STANDING

Article III of the Constitution requires plaintiffs in federal court to have standing to sue.[6] "[T]he plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and

---

[6] The Government does not appear to contest statutory or "prudential" standing, which unlike Article III standing can be waived. See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, 17 F.4th 129, 140 (Fed. Cir. 2021).

likely to be redressed by the lawsuit." Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "A plaintiff may establish its injury-in-fact 'in the same way as any other matter on which the plaintiff bears the burden of proof.'" Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (quoting Lujan, 504 U.S. at 561).

## I.     Article III Standing of V.O.S. Plaintiffs

A non-importer plaintiff may "fairly employ economic logic" to establish a concrete and particularized injury-in-fact that is fairly traceable to a challenged tariff. Id. at 1333. A plaintiff that takes that route must show that the challenged tariff is "likely to cause [the plaintiff] an economic injury," and that "this injury would be prevented by a declaratory judgment and injunction" setting that tariff aside. Id. at 1334. The V.O.S. Plaintiffs have done so here.

The businesses that bring the V.O.S. action—V.O.S. Selections, Genova Pipe, MicroKits, FishUSA, and Terry Cycling—allege and aver[7] that they have suffered (and will continue to suffer) economic injuries as a result of the Worldwide and Retaliatory Tariffs. See V.O.S. Compl. ¶¶ 52–56. V.O.S. alleges that the Worldwide and Retaliatory Tariffs have occasioned difficulties with sourcing and pricing, and also that "[t]he reduction in cash flow caused by increased tariffs also necessarily reduces the company's inventory and the level of business that V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign

---

[7] To establish standing at the summary judgment stage, a plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." Lujan, 504 U.S. at 561 (internal quotation marks and citation omitted). Executives of the various V.O.S. Plaintiffs have submitted declarations with their companies' motions. See Pls.' V.O.S. Mots. at Exs. A–E (Decls. of Victor Schwartz, Andrew Reese, David Levi, Dan Pastore, & Nikolaus Holm).

and domestic suppliers." Id. ¶ 52. Its CEO avers in a declaration that "[t]ariffs must be paid by V.O.S. upon arrival at the Port of New York, putting a large, immediate, strain on its cash flow." Schwartz Decl. ¶ 25. Genova Pipe alleges major sourcing problems stemming from the Worldwide Tariffs, and also that "[t]he tariffs will directly increase the cost of raw materials, manufacturing equipment, and resale goods imported from abroad by Genova Pipe." V.O.S. Compl. ¶ 53; see generally Reese Decl. MicroKits alleges that "[a]t the current rates" of the Worldwide and Retaliatory Tariffs it "cannot order parts from China and will have to pause operations when it runs out of parts," and also that as a result it "will likely be unable to pay its employees, will lose money, and as a result may go out of business." V.O.S. Compl. ¶ 54; see also Levi Decl. ¶ 13. FishUSA alleges that "[t]he tariffs have caused [it] to delay shipment of finished goods from China due to the unpredictability of the tariff rate that will be imposed when the product arrives, and [that] it has also paused production of some products," and states that these conditions inhibit its business growth. V.O.S. Compl. ¶ 55; see generally Pastore Decl. Terry Cycling alleges that it "has already paid $25,000 in unplanned tariffs this year for goods for which Terry was the importer of record," and "projects that the tariffs will cost the company approximately $250,000 by the end of 2025." V.O.S. Compl. ¶ 56; see generally Holm Decl.

These allegations and declarations establish the Article III standing of all V.O.S. Plaintiffs. While the Government objects that "no plaintiff has offered evidence that it has actually paid tariffs pursuant to the Executive Orders," Gov't Resp. to V.O.S. TRO Application at 17, Apr. 21, 2025, ECF No. 12, the Government does not meaningfully contest the "economic logic" tracing the Worldwide and Retaliatory Tariffs to the V.O.S. Plaintiffs' showings of downstream harm. See Canadian Lumber, 517 F.3d at 1333.

While the Government further objects that "[a]t the very least, the Court should hold that FishUSA and MicroKits lack standing, given that they do not even allege that they intend to import articles subject to the tariffs within any particular period of time," Gov't Resp. to V.O.S. TRO Application at 18, this point rests on an unsupported import-only rule of standing.[8]  To suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise.  Fair traceability is more flexible than that.  See Invenergy Renewables LLC v. United States, 43 CIT __, __, 422 F. Supp. 3d 1255, 1273 (2019) ("The court determines that this 'economic logic' applies here: the duty on bifacial panels will increase—and, with it, likely Plaintiffs' costs—if the Withdrawal goes into effect.").  Here, injuries like (1) the prohibitively high price of operationally necessary components, see Levi Decl., and (2) the stoppage of orders and product production, see Pastore Decl., are "concrete and imminent harm[s] to a legally protected interest, like property or money—that [are] fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  Biden v. Nebraska, 600 U.S. at 489.

## II.      Article III Standing of State Plaintiffs

The standing inquiry is even simpler for the State Plaintiffs.  The State Plaintiffs allege "direct financial harm" from the challenged tariffs' impact on the cost of imported goods that are "essential" to the states' provision of public services, see Oregon Compl. ¶¶ 94–112, and also from

---

[8] Responding to the State Plaintiffs' Motions, the Government argues that "[w]hile importers have standing to challenge tariffs, purchasers of imported goods do not."  Gov't Resp. to Oregon Mots. at 11.  For that proposition the Government quotes Totes-Isotoner Corp. v. United States, where the Federal Circuit held that "purchasers have no remedy to challenge the tariff classification." 594 F.3d 1346, 1352 (Fed. Cir. 2010).  This reference to a lack of a remedy, however, had nothing to do with the purchasers' Article III standing.  It instead had to do with the fact that a purchaser could not have "sought a refund of duties" that it never paid to Customs, a fact that in turn supported an importer's claim of third-party standing on the purchaser's behalf.  See id. at 1350.

their impact on "Plaintiff States' ability to procure goods and services and to budget for and audit price adjustments," id. ¶ 114.

The Government implicitly concedes that Oregon, Arizona, Colorado, and Connecticut are "importers who have personally paid tariffs" who thus "have standing to challenge tariffs." Gov't Resp. to Oregon Mots. at 11. The Government is right to make this concession: challenged conduct that "directly injures" a state can also "confer[] standing on that State." Biden v. Nebraska, 600 U.S. at 489. And an importer's allegation that it pays unlawful U.S. duties "typically would satisfy constitutional standing requirements." Totes-Isotoner, 594 F.3d at 1351.

Since "[i]f at least one plaintiff has standing, the suit may proceed," Biden v. Nebraska, 600 U.S. at 489 (citation omitted), there is no need to go further. The State Plaintiffs seek only broad injunctive and declaratory relief. That means that even if the non-importer states among them were to hypothetically lack standing, the contours of available relief would not change. See Oregon Compl. at 35–36.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).

28 U.S.C. § 2640(e) provides that "[i]n any civil action not specified in this section," which includes actions under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the matter as provided in section 706 of title 5." This references the "[s]cope of review" section of the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 706, which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

28 U.S.C. § 2640(e) does not address what happens when an action under 28 U.S.C. § 1581(i) challenges actions by the President, which unlike agency actions "are not subject to [the APA's] requirements." Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992). But the court "presume[s] that review is available when a statute is silent," Patel v. Garland, 596 U.S. 328, 346 (2022). Also, "claims that the President's actions violated the statutory authority delegated to him . . . are reviewable." USP Holdings, 36 F.4th at 1365. The Federal Circuit has observed that "[i]t is enough to say that some non-APA review remains available for constitutional issues, questions about the scope of statutory authority, and compliance with procedural requirements." Am. Inst. for Int'l Steel, Inc. v. United States, 806 F. App'x 982, 991 (Fed. Cir. 2020) (nonprecedential); see also Florsheim Shoe Co. v. United States, 744 F.2d 787, 795 (Fed. Cir. 1984) ("[T]he Executive's decisions in the sphere of international trade are reviewable only to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements."); Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985) ("For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."); United States v. Sears, Roebuck & Co., 20 C.C.P.A. 295, 305 (1932) (reviewing the President's issuance of a proclamation "for the purpose of determining whether he has exceeded the powers delegated to him.").

As it undertakes this review function, "[t]he Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." 28 U.S.C. § 1585.

**DISCUSSION**

Underlying the issues in this case is the notion that "the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments." Federalist No. 48 (James Madison). Because of the Constitution's express allocation of the tariff power to Congress, see U.S. Const. art. I, § 8, cl. 1, we do not read IEEPA to delegate an unbounded tariff authority to the President. We instead read IEEPA's provisions to impose meaningful limits on any such authority it confers. Two are relevant here. First, § 1702's delegation of a power to "regulate . . . importation," read in light of its legislative history and Congress's enactment of more narrow, non-emergency legislation, at the very least does not authorize the President to impose unbounded tariffs. The Worldwide and Retaliatory Tariffs lack any identifiable limits and thus fall outside the scope of § 1702. Second, IEEPA's limited authorities may be exercised only to "deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). As the Trafficking Tariffs do not meet that condition, they fall outside the scope of § 1701.

**I.      50 U.S.C. § 1702 Does Not Authorize the Worldwide and Retaliatory Tariffs**

Plaintiffs in both cases argue that the words "regulate . . . importation" do not confer the power to impose tariffs. See Pls.' V.O.S. Reply at 3; Pls.' Oregon Mot. at 15. Any other interpretation, according to Plaintiffs, would run afoul of both the nondelegation doctrine and the major questions doctrine. See Pls.' V.O.S. Mot at 15; Pls.' Oregon Mot. at 18–19. The

Government counters that the words "regulate . . . importation" have the same meaning that they did in TWEA, an older statute that was found to delegate a power to impose tariffs. See Gov't Resp. to V.O.S. Mots. at 17–19; Gov't Resp. to Oregon Mots. at 17–18.

Plaintiffs are correct in the narrow sense that the imprecise term "regulate . . . importation," under any construction that would comport with the separation-of-powers underpinnings of the nondelegation and major questions doctrines, does not authorize anything as unbounded as the Worldwide and Retaliatory Tariffs. See Jennings v. Rodriguez, 583 U.S. 281, 286 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead . . . adopt an alternative that avoids those problems."). The court in Yoshida II recognized that a case involving a claim to such unlimited authority might arise, observing that "[w]hether a delegation of such breadth as to have authorized [the tariffs here] would be constitutionally embraced, is determined . . . by the nature of the particular surcharge herein and its relationship to other statutes, as well as by its relationship to the particular emergency confronted." 526 F.2d at 576–77; see also Proclamation No. 4074, 85 Stat. 926. That case has arisen here.

### A.      An Unlimited Delegation of Tariff Authority Would Be Unconstitutional

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. 1, § 1. Congress is empowered "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers. Id. § 8, cl. 18. The Constitution thus establishes a separation of powers between the legislative and executive branches that the Framers viewed as essential to the preservation of individual liberty. See, e.g., The Federalist No. 48 (James Madison). To maintain this separation of powers, "[t]he Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative

functions with which it is thus vested." Pan. Refining Co. v. Ryan, 293 U.S. 388, 421 (1935); see also Marshall Field & Co. v. Clark, 143 U.S. 649, 692 (1892).

The parties cite two doctrines—the nondelegation doctrine and the major questions doctrine—that the judiciary has developed to ensure that the branches do not impermissibly abdicate their respective constitutionally vested powers. Under the nondelegation doctrine, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to fix such [tariff] rates is directed to conform." J.W. Hampton, Jr., 276 U.S. at 409 (1928); see also Pan. Refining, 293 U.S. at 429–30. A statute lays down an intelligible principle when it "meaningfully constrains" the President's authority. Touby v. United States, 500 U.S. 160, 166 (1991); see also Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 559–60 (1976). Under the major questions doctrine, when Congress delegates powers of "'vast economic and political significance,'" it must "speak clearly." Ala. Ass'n of Realtors v. HHS, 594 U.S. 758, 764 (2021) (quoting Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014)); Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst., 448 U.S. 607, 645 (1980). The doctrine applies in "'extraordinary cases' . . . in which the 'history and the breadth of the authority that [the executive branch] has asserted,' and the 'economic and political significance' of that assertion, provide 'a reason to hesitate before concluding that Congress meant to confer such authority.'" West Virginia v. EPA, 597 U.S. 697, 721 (2022) (quoting FDA v. Brown & Williamson Tobacco Co., 529 U.S. 120, 159–60 (2000)); see also Biden v. Nebraska, 600 U.S. at 501.

Plaintiffs and some Amici argue that the Government's interpretation transforms IEEPA into an impermissible delegation of power because "[t]he President's assertion of authority here has no meaningful limiting standards, essentially enabling him to impose any tariff rate he wants

on any country at any time, for virtually any reason." Pls.' <u>V.O.S.</u> Mots. at 25; <u>see also</u> Pls.' <u>Oregon</u> Mots. at 19; Pls.' <u>V.O.S.</u> Reply at 22. Similarly, Plaintiffs suggest that Congress's use of the words "regulate . . . importation" does not indicate the clear mandate necessary to delegate "such unbounded authority to the President to make such decisions of 'vast economic and political significance,'" as the wide-scale imposition of tariffs. Pls.' <u>Oregon</u> Mot. at 18; <u>see also</u> Pls.' <u>V.O.S.</u> Reply at 17; Inst. for Pol. Integrity's Amicus Br. at 16–18. The Government counters that IEEPA contains sufficient limitations: the President must declare a national emergency, the emergency expires after one year unless renewed, the emergency must be declared with respect to an "unusual and extraordinary threat," and the powers must extend only to property in which a foreign country or foreign national has an interest. Gov't Resp. to <u>V.O.S.</u> Mots. at 28–29.

The separation of powers is always relevant to delegations of power between the branches. Both the nondelegation and the major questions doctrines, even if not directly applied to strike down a statute as unconstitutional, provide useful tools for the court to interpret statutes so as to avoid constitutional problems. These tools indicate that an unlimited delegation of tariff authority would constitute an improper abdication of legislative power to another branch of government. Regardless of whether the court views the President's actions through the nondelegation doctrine, through the major questions doctrine, or simply with separation of powers in mind, any interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional.

       **1.**      **The Words "Regulate . . . Importation" Do Not Authorize the President to Impose Unlimited Tariffs**

With these principles in place, the court turns to the interpretive question at hand. Recall that both TWEA and IEEPA authorize the President to "regulate . . . importation." <u>See</u> 50 U.S.C. § 4305(b)(1)(B); <u>id.</u> § 1702(a)(1)(B). The court in <u>Yoshida II</u> noted that "[t]he express delegation

in [TWEA] is broad" and includes the power to "impos[e] an import duty surcharge." Yoshida II, 526 F.2d at 573, 576. While the words "regulate . . . importation" may exist in identical form in IEEPA, those words do not confer unlimited tariff authority.

In interpreting TWEA, the appellate court in Yoshida II recognized the importance of the separation of powers, noting the lower court's warning that "a finding that the President has the power under [TWEA] to impose whatever tariff rates he deems desirable simply by declaring a national emergency would not only render our trade agreements program nugatory, it would subvert the manifest Congressional intent to maintain control over its Constitutional powers to levy tariffs." Yoshida II, 526 F.2d at 577 (quoting Yoshida I, 378 F. Supp. at 1182 (Maletz, J., concurring)). Though the appellate court in Yoshida II interpreted TWEA so as to include tariff authority, the court also repeatedly noted the constitutional concerns that would arise if the President exercised unlimited tariff authority based on the words "regulate . . . importation." For example, the court stated that "[t]he mere incantation of 'national emergency' cannot, of course, sound the death-knell of the Constitution." Id. at 583. Indeed, according to the court, "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules." Id.[9] While the court in Yoshida II ultimately reversed the lower court's decision and upheld President Nixon's tariffs, it upheld the tariffs on the basis that they were limited, "which is quite different from imposing whatever tariff rates he deems desirable." Id. at 578 (internal

---

[9] This concern is even more significant today given the limited nature of Congress's review over national emergencies. Recall that the NEA originally provided Congress with the means to terminate a national emergency by adopting a concurrent resolution. See National Emergencies Act, Pub. L. No. 94-412, § 201, 90 Stat. 1255, 1255–56 (1976) (codified as amended at 50 U.S.C. § 1622). Today the NEA is much less restricted, requiring Congress to act with a veto-proof majority of both houses. See Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 98 Stat. 405, 448 (1985) (codified as amended at 50 U.S.C. § 1622).

quotation marks omitted).

The limitations of President Nixon's tariffs were essential to the court's determination that "regulate . . . importation" permitted the President's actions in Yoshida II. For example, the court noted that President Nixon did not "fix[] rates in disregard of congressional will." Id. at 577. The court emphasized that President Nixon "imposed a limited surcharge, as a temporary measure calculated to help meet a particular national emergency, which is quite different from imposing whatever tariff rates he deems desirable." Id. at 578 (internal quotation marks and citation omitted) (emphasis added). The court emphasized further that it was not deciding a case in which the President exerted unlimited tariff authority, and that "presidential actions must be judged in the light of what the President actually did, not in the light of what he could have done." Id. at 577. The court also explicitly stated that its decision did not "approve in advance any future surcharge of a different nature," id., and its decision did "not here sanction the exercise of an unlimited power, which, we agree with the Customs Court, would be to strike a blow to our Constitution," id. at 583.

Like the court in Yoshida II, this court does not read the words "regulate . . . importation" in IEEPA as authorizing the President to impose whatever tariff rates he deems desirable. Indeed, such a reading would create an unconstitutional delegation of power. See id. Importantly, President Trump's tariffs do not include the limitations that the court in Yoshida II relied upon in upholding President Nixon's actions under TWEA. Where President Nixon's tariffs were expressly limited by the rates established in the HTSUS, see Proclamation No. 4074, 85 Stat. at 927, the tariffs here contain no such limit. Absent these limitations, this is exactly the scenario

that the lower court warned of in Yoshida I—and that the appellate court acknowledged in Yoshida II.

In sum, just as the court recognized in Yoshida II, the words "regulate . . . importation" cannot grant the President unlimited tariff authority. Thus, this court reads "regulate . . . importation" to provide more limited authority so as to avoid constitutional infirmities and maintain the "separate and distinct exercise of the different powers of government" that is "essential to the preservation of liberty." The Federalist No. 51 (Alexander Hamilton or James Madison).

### B. Congress Delegated Narrower Authority to the President Through IEEPA than It Delegated Through TWEA

While TWEA and IEEPA both grant the President the power to "regulate . . . importation," see 50 U.S.C. § 4305(b)(1)(B); id. § 1702(a)(1)(B), Congress enacted IEEPA with the intent of limiting presidential power. The legislative history surrounding IEEPA confirms that the words "regulate . . . importation" have a narrower meaning than the power to impose any tariffs whatsoever. Id. § 1702(a)(1)(B). Congress's enactment of Section 122 of the Trade Act of 1974, see Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (codified at 19 U.S.C. § 2132), and Section 301 of the Trade Act of 1974, see Pub. L. No. 93-618, § 301, 88 Stat. 1978, 2041 (codified at 19 U.S.C. § 2411), grants the President authority to impose restricted tariffs in response to "fundamental international payment problems," including "large and serious balance-of-payments deficits," and unfair trading practices, thereby limiting any such authority in the broader emergency powers under IEEPA. Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (1974).

In enacting reform legislation including IEEPA, Representative John Bingham, Chair of the House International Relations Committee's Subcommittee on Economic Policy, described

TWEA as conferring "on the president what could have been dictatorial powers that he could have used without any restraint by the Congress." House Committee on International Relations, 95th Cong., Revision of the Trading with the Enemy Act: Markup before the Committee on International Relations 5 (Comm. Print 1977). Similarly, the House report on the reform legislation called TWEA "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." Comm. on Int'l Rels., Trading with the Enemy Act Reform Legislation, H.R. Rep. No. 95-459, at 7 (1977).

Congress reformed the President's emergency powers in part by enacting IEEPA to provide "the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations, including those of the [NEA]." Id. at 2; see also International Emergency Economic Powers Act, Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10). Thus, Congress enacted IEEPA to limit executive authority over international economic transactions, not merely to continue the executive authority granted by TWEA.

1.     **Congress Cabined the President's Authority to Impose Tariffs in Response to Balance-of-Payments Deficits to Non-Emergency Legislation**

When President Nixon imposed in 1971 the tariffs challenged in Yoshida II, he was responding to a monetary crisis—brought on by the peg of the U.S. dollar to a fixed price of 35 dollars per ounce of gold—as reflected in part in growing balance-of-payments deficits. See The Office of the Historian, Nixon and the End of the Bretton Woods System, 1971-1973, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last visited May 28, 2025). External values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in

turn expressed in gold at a congressionally set price.  See id.  A surplus of U.S. dollars threatened the ability of the United States to meet its obligations and, thereby, the entire Bretton Woods system, as the United States did not have enough gold to cover the volume of dollars in worldwide circulation.  See id.  Accordingly, on August 15, 1971, President Nixon immediately cancelled the direct international convertibility of the U.S. dollar to gold, took a series of other actions such as the imposition of wage and price controls, and issued Proclamation 4074 in which he declared a national emergency and introduced a ten percent import surcharge.[10]  See Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45168, The International Emergency Economic Powers Act: Origins, Evolution, and Use 2 (2024).

In 1974, Congress enacted the Trade Act, including Section 122 dealing with remedies for balance-of-payments deficits.  See Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987–89 (codified at 19 U.S.C. § 2132).  Section 122 is titled "[b]alance-of-payments authority" and specifically addresses Presidential proclamations of "temporary import surcharge[s]" and "temporary limitations through the use of quotas" in situations of "fundamental international payments problems."  Id.  Section 122 sets specific limits on the President's authority to respond to balance-of-payments problems, such as a 15 percent cap on tariffs and a maximum duration of 150 days.  See id.  Congress's enactment of Section 122 indicates that even "large and serious United States balance-of-payments deficits" do not necessitate the use of emergency powers and justify only the President's imposition of limited remedies subject to enumerated procedural constraints.  See id.; see also Yoshida II, 526 F.2d at 578 ("Congress has said what may be done with respect to foreseeable events in the Tariff Act, the [Trade Expansion Act], and in the Trade

---

[10] Notably, Proclamation 4074 did not mention TWEA.  See generally 85 Stat. 926.

Act of 1974 (all of which are in force) and has said what may be done with respect to unforeseeable events in the TWEA."). In these ways, Section 122 removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA by establishing an explicit non-emergency statute with greater limitations.[11]

The President's imposition of the Worldwide and Retaliatory Tariffs responds to an imbalance in trade—a type of balance-of-payments deficit—and thus falls under the narrower, non-emergency authorities in Section 122. The balance-of-payments is the "[r]ecord of transactions between U.S. residents and foreign residents during a given time period . . . includ[ing] transactions in goods, services, income, assets, and liabilities," and always balances to zero. Balance of Payments, Bureau of Econ. Analysis (last modified Apr. 11, 2018), https://www.bea.gov/help/glossary/balance-payments. The term "balance-of-payments deficits" within Section 122 refers, necessarily, to deficits within the various accounts comprising the

---

[11] The court in Yoshida II recognized that before Section 122 was in effect, the Nixon surcharge "did not run counter to any explicit legislation" and there existed no statute "other than the TWEA, providing procedures for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971." United States v. Yoshida Int'l, Inc., 526 F.2d 560, 578 (C.C.P.A. 1975) (internal quotation marks omitted). The court in Yoshida II recognized further that after Section 122 was in effect, Section 122's limits would apply regardless of whether an emergency declared was extant. Id. at 582 n.33. The court noted that the balance-of-payments emergency declared by President Nixon had not been terminated, in contradiction with the expectation that "emergencies are expected to be shortlived." Id. at 582. However, the court found that "the failure to terminate the emergency has been rendered moot by Congressional enactment of [Section 122], specifically requiring the President, within certain parameters, to impose a surcharge or quotas in response to balance of payments problems." Id. at 582 n.33. The court concluded that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action." Id. Thus, the court reasoned that any tariffs imposed in response to the balance-of-payments problem after the enactment of Section 122, including any imposed in response to the balance-of-payments emergency declared by President Nixon, must comply not with a broad emergency statute, but with Section 122.

balance-of-payments (including the trade of goods) rather than to an overall summary deficit, because there cannot be a balance-of-payments deficit per se. Trade deficits are one of the key balance-of-payment deficits and can be directly impacted by mechanisms such as import quotas and tariffs, as authorized by Section 122. As a result, tariffs responding to a trade deficit fit under Section 122 because they "deal with [a] large and serious United States balance-of-payments deficit[]." 19 U.S.C. § 2132(a)(1). Thus, the President's Worldwide and Retaliatory Tariffs, imposed in response to a balance-of-payments deficit, must conform with the limits of Section 122.

The legislative history surrounding IEEPA confirms that Congress cabined any presidential authority to impose tariffs in response to balance-of-payments deficits to a narrower, non-emergency statute. To prevent IEEPA from becoming another "essentially . . . unlimited grant of authority," the House International Relations Committee suggested that "whenever possible, authority for routine, non[-]emergency regulation of international economic transactions which has heretofore been conducted under [TWEA] should be transferred to other legislation," and further stated that IEEPA "does not include authorities more appropriately lodged in other legislation . . . ." H.R. Rep. No. 95-459 at 7, 10–11. This reflects that in enacting Section 122, Congress narrowed the President's emergency authority to impose tariffs in response to balance-of-payments deficits. The words "regulate . . . importation" within IEEPA do not, therefore, permit the President to impose tariffs in response to balance-of-payments deficits.

Because the Worldwide and Retaliatory Tariffs deal with "large and persistent annual U.S. goods trade deficits," Executive Order 14257, 90 Fed. Reg. at 15041, these actions address a balance-of-payments deficit and therefore must comply with the limitations in Sections 122. The

Worldwide and Retaliatory Tariffs do not comply with the limitations Congress imposed upon the

President's power to respond to balance-of-payments deficits.    The President's assertion of

tariff-making authority in the instant case, unbounded as it is by any limitation in duration or scope,

exceeds any tariff authority delegated to the President under IEEPA.    The Worldwide and

Retaliatory tariffs are thus ultra vires and contrary to law.

### II.        50 U.S.C. § 1701 Does Not Authorize the Trafficking Tariffs

IEEPA does not authorize the Trafficking Tariffs for the separate reason that they do not

satisfy the conditions that Congress imposed in 50 U.S.C. § 1701:

> (a) Any authority granted to the President by section 1702 of this title may be
> exercised to deal with any unusual and extraordinary threat, which has its source in
> whole or substantial part outside the United States, to the national security, foreign
> policy, or economy of the United States, if the President declares a national
> emergency with respect to such threat.

> (b) The authorities granted to the President by section 1702 of this title may only
> be exercised to deal with an unusual and extraordinary threat with respect to which
> a national emergency has been declared for purposes of this chapter and may not
> be exercised for any other purpose.  Any exercise of such authorities to deal with
> any new threat shall be based on a new declaration of national emergency which
> must be with respect to such threat.

This provision limits the President's exercise of IEEPA powers to a limited set of situations.  Cf.

Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1346 (Fed. Cir. 2018) (identifying a statutory

"condition necessary for the President to take action").  Under it, IEEPA powers are available only

where all of the following conditions pertain:  First, there must be a "threat . . . which has its source

in whole or substantial part outside the United States, to the national security, foreign policy, or

economy of the United States."  50 U.S.C. § 1701(a).  Second, this threat must be "unusual and

extraordinary."  Id. § 1701(b).  Third, a national emergency must be declared with respect to the

threat.  Id.  And fourth, the President's exercise of IEEPA authority must "deal with" the threat.

Id.

Both sets of Plaintiffs assert that the orders implementing the Worldwide and Retaliatory Tariffs ("Worldwide and Retaliatory Tariff Orders") do not meet the "unusual and extraordinary" condition[12] imposed by this section, see Pls.' V.O.S. Mots. at 18; Pls.' Oregon Mot. at 20, and the State Plaintiffs argue that the orders implementing the Trafficking Tariffs ("Trafficking Tariff Orders") do not meet the "deal with" condition, see Pls.' Oregon Mot. at 25.

By the Government's telling, the court cannot ever question the President's assertion that his IEEPA authority "deal[s] with an unusual and extraordinary threat." See Gov't Resp. to Oregon Mots. at 33. The Government invokes the "political question doctrine," under which "a controversy is nonjusticiable . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" Nixon v. United States, 506 U.S. 224, 228 (1993) (alteration omitted) (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)). The court concludes, however, that the question of the scope of § 1701 is (1) a justiciable question of statutory construction that (2) resolves in favor of Plaintiffs' contention that the Trafficking Tariff Orders do not "deal with an unusual and extraordinary threat." 50 U.S.C. § 1701(b). Those Orders thus lie outside the bounds of Congress's delegation of authority to the executive branch.

### A.    The Political Question Doctrine Does Not Preclude Judicial Review of the Trafficking Orders' Compliance with 50 U.S.C. § 1701

The political question doctrine bars judicial review in a number of different scenarios. The

---

[12] As the court holds that the Worldwide and Retaliatory Tariffs are unlawful for the reasons set forth in Section I of this opinion, the court does not reach the argument that their implementing Orders separately fail to invoke an "unusual and extraordinary threat." 50 U.S.C. § 1701.

Supreme Court has listed them as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217; see also Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 195, (2012) (explaining that "a court lacks the authority to decide the dispute before it" when one of the Baker factors pertains). The Court clarified, however, that this is not a "doctrine . . . of 'political cases,'" Baker, 369 U.S. at 217, and that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," id. at 211.

The Government argues that two Baker factors preclude the court's review of whether the challenged Tariff Orders are permissible under § 1701's "deal with an unusual and extraordinary threat" standard. The Government asserts "a profound 'lack of judicially discoverable and manageable standards for resolving' the validity of the President's threat assessment," and also the "impossibility of deciding [the question] without an initial policy determination of a kind clearly for nonjudicial discretion." Gov't Resp. to Oregon Mots. at 30–31 (quoting Baker, 369 U.S. at 217).

This reliance on the political question doctrine is misplaced. The court can "manage" the standards for applying 50 U.S.C. § 1701's "deal with an unusual and extraordinary threat" language just as it "manages" the standards for any other statutory enactment that constrains independent executive action. See Feliciano v. Dep't of Transp., 605 U.S. __, __, 145 S. Ct. 1284, 1291 (2025) (listing instances of substantive conditions that federal statutes impose on the exercise

of executive authority). "[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986).

Even when it goes unmentioned, this principle is a common feature of statutory construction. In the trade context, for example, the antidumping statute permits the imposition of duties only where "the Commission determines that . . . an industry in the United States . . . is threatened with material injury." 19 U.S.C. § 1673. The court does not automatically uphold every material injury determination of the ITC on lack-of-manageable-standards grounds simply because "threatened with material injury" is an imprecise term that sounds in foreign affairs. Instead, the court consults "the traditional tools of statutory construction" to ascertain the term's meaning and applies that meaning to specific cases. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 403 (2024); see, e.g., Rhone Poulenc, S.A. v. United States, 8 CIT 47, 50–54, 592 F. Supp. 1318, 1322–25 (1984) (citing legislative history for the proposition that while "[i]t is true that threat of material injury may not be based on supposition or conjecture . . . [t]he threat must be real and imminent"). As the Supreme Court explained in Zivotofsky, "[r]esolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do. The political question doctrine poses no bar to judicial review of this case." 566 U.S. at 201.

Indeed, that "[t]rade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is traditionally accorded considerable deference . . . is not to

say . . . that courts will unthinkingly defer to the Government's view of Congressional enactments." Fed.-Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995). This is especially so where the relevant congressional enactment is exactly what determines how much deference the President is entitled to in the first place. See U.S. Cane Sugar Refiners' Ass'n, 3 CIT at 212, 544 F. Supp. at 895 ("[I]f the President's action is authorized by the statutes relied upon, the judiciary may not properly inquire or probe into the President's reasoning or into the existence of the facts calling for the action taken." (emphasis added)). Either § 1701 entails that the President invokes IEEPA "pursuant to an express or implied authorization of Congress," which would mean that "his authority is at its maximum," or § 1701 entails that he invokes it "incompatibl[y] with the expressed or implied will of Congress," which would mean that "his power is at its lowest ebb." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–37 (1952) (Jackson, J., concurring). If a court could never question the President's interpretation of statutory language to place himself in Justice Jackson's first zone, there would only be one zone. "[T]he issue here . . . involves the apportionment of power between the executive and legislative branches," and "[t]he duty of courts to decide such questions has been repeatedly reaffirmed by the Supreme Court." Crockett v. Reagan, 558 F. Supp. 893, 898 (D.D.C. 1982), aff'd, 720 F.2d 1355 (D.C. Cir. 1983) (per curiam).

The Government's position on the unreviewability of § 1701 is also at odds with IEEPA's text. Section 1701 is not the particular type of "statute [that] gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts," such that "it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts." Martin v. Mott, 25 U.S. 19, 31–32 (1827). That may be true of the NEA, whose

operation requires only that the President "specifically declare[] a national emergency." 50 U.S.C. § 1621(b); see also Yoshida II, 526 F.2d at 581 n.32.[13] But IEEPA requires more than just the fact of a presidential finding or declaration: "The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). This language, importantly, does not commit the question of whether IEEPA authority "deal[s] with an unusual and extraordinary threat" to the President's judgment. It does not grant IEEPA authority to the President simply when he "finds" or "determines" that an unusual and extraordinary threat exists. Cf., e.g., Silfab Solar, 892 F.3d at 1349 (collecting cases involving "statute[s] authoriz[ing] a Presidential 'determination'"); United States v. George S. Bush & Co., 310 U.S. 371, 376–77 (1940).

Section 1701 is not a symbolic festoon; it is a "meaningful[] constrain[t] [on] the President's discretion," United States v. Dhafir, 461 F.3d 211, 216 (2d Cir. 2006) (internal quotation marks, alteration, and citation omitted). It sets out "the happening of the contingency on which [IEEPA powers] depend," and the court will give it its due effect. The Aurora, 11 U.S. (7 Cranch) 382, 386 (1813).

Congress enacted § 1701, after all, as a substantive addition to TWEA's basic framework. And "[w]hen Congress amends legislation," courts must "presume it intends the change to have real and substantial effect." Ross v. Blake, 578 U.S. 632, 641–42 (2016) (internal quotation marks,

---

[13] The State Plaintiffs confirm that they "are not challenging the President's declaration of an emergency under the National Emergencies Act." Pls.' Oregon Mot. at 21.

alteration, and citation omitted).  Thus, although "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available," Dalton v. Specter, 511 U.S. 462, 477 (1994), § 1701 is a statute that conditions this commitment on factors that the court retains the power to review.

In doing so, the court does not ask whether a threat is worth "deal[ing]" with, or venture to "review the bona fides of a declaration of an emergency by the President."  Yoshida II, 526 F.2d at 581 n.32; see also United States v. Am. Bitumuls & Asphalt Co., 246 F.2d 270, 276–77 (C.C.P.A. 1957) ("No doubt the courts cannot substitute their discretion for that of the President in proclaiming trade agreements, but where, as here, the President bases his action on an incorrect interpretation of the effect of a law or proclamation, the courts are not bound to accept that interpretation as correct.").

Indeed, "[t]he question here is not whether something should be done; it is who has the authority to do it."  Biden v. Nebraska, 600 U.S. at 501.  The court simply asks whether the President's action "deal[s] with an unusual and extraordinary threat."  Congress provided the necessary standards for resolving this inquiry when it enacted IEEPA, and the court's task is to apply them.  "This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said."  United States v. Am. Trucking Ass'ns, 310 U.S. 534, 544 (1940).  The duty does not abate when foreign economic conduct forms part of the issue. See Totes-Isotoner, 594 F.3d at 1352–53.

According to the Government, there are two ways that the "deal with an unusual and extraordinary threat" provision retains its meaning despite its unreviewability.  The first is that "it . . . binds the President."  V.O.S. Oral Arg. Tr. at 47:11–12 (statement of E. Hamilton), May

27, 2025, ECF No. 54. This means, the Government states, that "[t]he President still has to look at and faithfully apply that statute . . . ." V.O.S. Oral Arg. Tr. at 47:11–13 (statement of E. Hamilton). But what happens if the President does not do so? Does the court still have no role? Even if Congress could hypothetically undo the President's invocation of IEEPA powers by passing a law to that effect (over the President's likely veto, see generally Chadha, 462 U.S. 919), Congress's inherent power to legislate is no substitute for the "judicial function" of "determining the limits of statutory grants of authority." Stark v. Wickard, 321 U.S. 288, 310 (1944). "The supremacy of law," moreover, "demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied." St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 84 (1936) (Brandeis, J., concurring).

The Government also argues that § 1701 "informs legislative review of any national emergency declared under IEEPA." V.O.S. Oral Arg. Tr. at 47:16–18 (statement of E. Hamilton). But Congress has already legislated on the relevant question by enacting IEEPA "to limit the President's emergency power in peacetime." Dames & Moore v. Regan, 453 U.S. 654, 672–73 (1981). Congress should not have to enact new statutes to enforce the statutory constraints it has already enacted.

### B. The Trafficking Orders Fall Outside 50 U.S.C. § 1701's Delegation of Authority

The court proceeds to adjudicate the justiciable question of whether the Trafficking Orders satisfy the statutory requirement that IEEPA powers be exercised only to "deal with an unusual and extraordinary threat." 50 U.S.C. § 1701.

The State Plaintiffs[14] do not argue that the Trafficking Orders fail to invoke "unusual and extraordinary threat[s]," as they do regarding the Worldwide and Retaliatory Tariffs (an argument that the court does not reach). Instead, the State Plaintiffs argue that the Trafficking Tariffs do not "deal with" the specific threats[15] they invoke. See Pls.' Oregon Mot. at 25–26; Pls.' Oregon Supp'l Br. at 4. The Government responds that "the President's actions are reasonably related to the desired change in behavior the President seeks from Mexico, Canada, and China because the President's actions pressure those countries to address the crisis." Gov't Resp. to Oregon Mots. at 39.[16]

By this description, and by their own language, the Trafficking Tariff Orders rest on a construction of "deal with" that is at odds with the ordinary meaning of the phrase.

"Deal with" connotes a direct link between an act and the problem it purports to address. A tax deals with a budget deficit by raising revenue. A dam deals with flooding by holding back a river. But there is no such association between the act of imposing a tariff and the "unusual and

---

[14] The V.O.S. Plaintiffs do not seek to enjoin the operation of the Trafficking Tariff Orders. See V.O.S. Compl. at 24.

[15] The Canada Tariff Order purports to "address" an "unusual and extraordinary threat" in the form of "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Executive Order 14193, 90 Fed. Reg. at 9113. The Mexico Tariff Order identifies a threat in the form of "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." Executive Order 14194, 90 Fed. Reg. at 9118. And the China Tariff Order refers to the "failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." Executive Order 14195, 90 Fed. Reg. at 9122.

[16] Counsel for the Government stated at oral argument that "[t]he purpose of these tariffs is to create pressure, to tariff-pressure other countries to change bad behaviors that the President believes are hurting Americans and our national security." Oregon Oral Arg. Tr. at 31:19–22 (statement of B. Shumate), May 27, 2025, ECF No. 64.

extraordinary threat[s]" that the Trafficking Orders purport to combat. Customs's collection of tariffs on lawful imports does not evidently relate to foreign governments' efforts "to arrest, seize, detain, or otherwise intercept" bad actors within their respective jurisdictions. The Government's only suggested connection between these two activities—that "[t]he President's action . . . deters importation of illicit drugs concealed within seemingly lawful imports," Gov't Resp. to Oregon Mots. at 40—has no apparent basis in the Trafficking Orders themselves. The Orders cite the general problem of a failure to thwart trafficking and other crime as their target "unusual and extraordinary threat[s]," not the specific problem of drugs smuggled within shipments of dutiable merchandise.[17] And if this specific problem were really what the Trafficking Tariff Orders aimed to "deal with," the Orders would have to "deal with" that specific problem, not create "leverage" ostensibly to do so. 50 U.S.C. § 1701(b).

The Trafficking Orders do not "deal with" their stated objectives. Rather, as the Government acknowledges, the Orders aim to create leverage to "deal with" those objectives. See Oregon Oral Arg. Tr. at 31:19–25, 33:7–16 (statements of B. Shumate). That approach differs from what the Yoshida II court identified was Proclamation 4074's "direct effect on our nation's balance of trade and, in turn, on its balance of payments deficit and its international monetary reserves." 526 F.2d at 580. The approach also differs from the relationship identified in Regan v. Wald, where the Supreme Court sustained on constitutional grounds "the President's decision to curtail the flow of hard currency to Cuba—currency that could then be used in support of Cuban adventurism—by restricting travel." 468 U.S. at 243.

---

[17] The Trafficking Tariffs, of course, do not change the effective rate of duty (zero percent ad valorem) for smuggled drugs themselves.

The Government's "pressure" argument effectively concedes that the direct effect of the country-specific tariffs is simply to burden the countries they target. It is the prospect of mitigating this burden, the Government explains, that will induce the target countries to crack down on trafficking within their jurisdictions. See Gov't Resp. to Oregon Mots. at 39. But however sound this might be as a diplomatic strategy, it does not comfortably meet the statutory definition of "deal[ing] with" the cited emergency. It is hard to conceive of any IEEPA power that could not be justified on the same ground of "pressure."

The Government's reading would cause the meaning of "deal with an unusual and extraordinary threat" to permit any infliction of a burden on a counterparty to exact concessions, regardless of the relationship between the burden inflicted and the concessions exacted. If "deal with" can mean "impose a burden until someone else deals with," then everything is permitted. It means a President may use IEEPA to take whatever actions he chooses simply by declaring them "pressure" or "leverage" tactics that will elicit a third party's response to an unconnected "threat." Surely this is not what Congress meant when it clarified that IEEPA powers "may not be exercised for any other purpose" than to "deal with" a threat.

The court in Yoshida II explained that "[w]hether a delegation of such breadth as to have authorized Proclamation 4074 would be constitutionally embraced" was a function of the surcharge's "relationship to the particular emergency confronted." 526 F.2d at 576–77. The court further explained that "[a] standard inherently applicable to the exercise of delegated emergency powers is the extent to which the action taken bears a reasonable relation . . . to the emergency giving rise to the action," and that "the nature of the emergency restricts the how of its doing, i.e., the means of execution." Id. at 578–79.

The Government's concept of "leverage" would sap these words of their meaning.  The President's chosen "means of execution" here are tariffs on "[a]rticles that are products of Canada," Executive Order 14193, 90 Fed. Reg. at 9114, "[a]ll articles that are products of Mexico," Executive Order 14194, 90 Fed. Reg. at 9118, and "[a]ll articles that are products of the PRC," Executive Order 14195, 90 Fed. Reg. at 9122.  If leverage were all it took to establish a "reasonable relation" between these means and the "particular emergency" of trafficking, Yoshida II's means-end test would be trivially easy to pass.  See 526 F.2d at 578–79.

In so holding, the court does not pass upon the wisdom or likely effectiveness of the President's use of tariffs as leverage.[18]  That use is impermissible not because it is unwise or ineffective, but because § 1701 does not allow it.  Rather, the Trafficking Orders' "clear misconstruction" of § 1701's "deal with" condition renders them "action[s] outside delegated authority."  Maple Leaf Fish, 762 F.2d at 89.

Soon after joining the Supreme Court, Justice Story declared invalid a proclamation by President Madison that revived an embargo on trade with Britain and France in the Non-Intercourse Act of 1809.  The proclamation lacked statutory authority because it relied on an

---

[18] Another three-judge panel of this court made a similar point in Tembec, Inc. v. United States:

> Consideration of the USTR's authority to order implementation of affirmative section 129(a) determinations does not depend on the court's evaluation of the wisdom of a given implementation. The court is neither called upon to make trade policy, nor to direct the USTR as to whether any section 129 determination should be implemented.  Rather, the court is merely asked to determine the bounds of the USTR's authority to order implementation.

30 CIT 958, 982–83, 441 F. Supp. 2d 1302, 1326–27 (2006), judgment vacated as moot by 31 CIT 241, 251, 475 F. Supp. 2d 1393, 1401–02 (leaving prior decision in place for precedential purposes despite vacatur of judgment).

expired embargo provision in the Act. The young Justice's account of the judicial role in that case applies undiminished today:

> I take it to be an incontestable principle, that the president has no common law prerogative to interdict commercial intercourse with any nation; or revive any act, whose operation has expired. His authority for this purpose must be derived from some positive law . . . . For the executive department of the government, this court entertain the most entire respect; and amidst the multiplicity of cares in that department, it may, without any violation of decorum, be presumed, that sometimes there may be an inaccurate construction of a law. It is our duty to expound the laws as we find them in the records of state; and we cannot, when called upon by the citizens of the country, refuse our opinion, however it may differ from that of very great authorities. I do not perceive any reasonable ground to imply an authority in the president to revive this act, and I must therefore, with whatever reluctance, pronounce it to have been, as to this purpose, invalid.

The Orono, 18 F. Cas. 830, 830–31 (C.C.D. Mass. 1812) (No. 10,585).

## CONCLUSION

The court holds for the foregoing reasons that IEEPA does not authorize any of the Worldwide, Retaliatory, or Trafficking Tariff Orders. The Worldwide and Retaliatory Tariff Orders exceed any authority granted to the President by IEEPA to regulate importation by means of tariffs. The Trafficking Tariffs fail because they do not deal with the threats set forth in those orders. This conclusion entitles Plaintiffs to judgment as a matter of law; as the court further finds no genuine dispute as to any material fact, summary judgment will enter against the United States. See USCIT R. 56. The challenged Tariff Orders will be vacated and their operation permanently enjoined.

There is no question here of narrowly tailored relief; if the challenged Tariff Orders are unlawful as to Plaintiffs they are unlawful as to all. "[A]ll Duties, Imposts and Excises shall be uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1, and "[t]he tax is uniform when it operates with the same force and effect in every place where the subject of it is found." Head

Money Cases, 112 U.S. 580, 594 (1884); see also Siemens Am., Inc. v. United States, 692 F.2d 1382, 1383 (Fed. Cir. 1982); Nat'l Corn Growers Ass'n v. Baker, 10 CIT 517, 521, 643 F. Supp. 626, 630–31 (1986) (noting "the statutory and constitutional mandate of uniformity in the interpretation of the international trade laws").

Plaintiffs' Motions for Summary Judgment are granted, and their Motions for Preliminary Injunction are denied as moot.  Judgment will enter accordingly.

By the panel.

Dated: May 28, 2025
       New York, New York